Filed 5/1/13; part. pub. 5/31/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| In re L. J., a Person Coming Under the Juvenile Court Law. | C071919 |
| :--- | :---: |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C. W. et al.,<br><br>Defendants and Appellants. | (Super. Ct. No. JD231066) |

| In re L. J., a Person Coming Under the Juvenile Court Law. | C072166 |
| :--- | :---: |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C. W.,<br><br>Defendant and Appellant. | (Super. Ct. No. JD231066) |

1

In this case, a juvenile court referee made an order terminating the parental rights of C.W. (father) and La.J. (mother) as to minor L.J. (Welf. & Inst. Code, § 366.26.) (Case No. C071919.) Both parents filed notice of appeal from that order. However, father simultaneously moved for rehearing or reconsideration of the order (§ 252; Code Civ. Proc., § 1008),[1] alleging the hearing proceeded in his absence despite his voice mail message to the court clerk advising that he would be late. The referee purported to grant the motion and to set aside the order. At a subsequent hearing attended by father, the referee made a new order purporting once again to terminate the parental rights of both parents. Father alone filed a notice of appeal from this order. (Case No. C072166.)

After receiving father's notice of appeal from the second order, we requested letter briefs from the parties as to whether the first appeal was moot and consolidated the appeals on our own motion and. Having read and considered those briefs, we conclude that the appeal in case No. C071919 is not moot because the referee's original order terminating parental rights was final and conclusive. We also conclude that because all acts done by the referee after issuing that order were void for lack of jurisdiction, the appeal in case No. C072166 must be dismissed.

On the merits, the parents contend that the matter must be remanded due to failure of compliance with the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). Mother, joined by father, also contends that the juvenile court abused its discretion by denying mother's request for placement of the minor with the maternal grandmother. Respondent Sacramento County Department of Health and Human Services (the Department) disputes both contentions and asserts that the disentitlement doctrine bars the parents' appeals because they actively concealed the minor's whereabouts for over a year.

---

[1] Undesignated section references are to the Welfare and Institutions Code.

We conclude (1) the disentitlement doctrine does not apply; (2) assuming mother has standing to attack the denial of placement with the maternal grandmother, the court did not err by denying that placement; and (3) a limited ICWA remand is required. We reverse in case No. C071919 for further proceedings limited to ICWA and dismiss father's appeal in case No. C072166.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 22, 2010, the Department filed a section 300 petition as to the minor, alleging the minor (born in early 2010) was at substantial risk of physical harm in that, while the minor was riding in mother's car, mother physically abused the minor's older half sibling D.J. The minor was also at substantial risk of physical harm, abuse, and/or neglect in that D.J. and the minor's three siblings were adjudicated dependent children due to domestic violence between father and mother, and to mother's substance abuse problem; as to the three siblings, family reunification services were terminated in May 2010. The parents had failed to maintain contact with the Department and had failed to make the minor available, insisting that she resided with relatives out of county.

In the Department's application for a protective custody warrant, the social worker's declaration contained the following information:

The minor's three siblings were court-ordered to a permanent plan of adoption pending an upcoming section 366.26 hearing.

On October 18, 2010, the Department's Division of Child Protective Services (CPS) received a referral alleging that on October 14, 2010, the minor's maternal grandmother, Barbara J., had kicked the minor's half sibling D.J. out of her home. D.J. stayed with a friend before being transported to the Children's Receiving Home on October 17, 2010, where he was released to mother. Thereafter, the incident described in the section 300 petition occurred, and the court issued a protective custody warrant for

3

him.[2] D.J. told the social worker that the minor's parents were concealing the minor from CPS.

Mother reported to the social worker that the minor was with a relative in the Bay Area but would not disclose the relative's name or location.

According to the family reunification social worker, mother was not complying with her substance abuse and domestic violence services, and had not returned the social worker's calls in months.

Father had been booked and arrested on a no-bail warrant on October 17, 2010, and was to be released on October 22, 2010.

CalWORKs staff stated that mother had an active case, was receiving aid for the minor and D.J., and had been seen with the minor at the office the previous month.

A protective warrant was issued. A detention report, filed thereafter on October 27, 2010, contained additional information. Father was released from custody but remained on informal probation until September 11, 2013. The social worker attempted twice on October 22, 2010, to execute the warrant for the minor at the residence where father lived with the paternal grandmother, Patricia B.; the home appeared "closed up," and notices were left there for the parents. On October 23, 2010, the social worker attempted to execute the warrant at the home of the maternal grandmother, Barbara J.; again, the home appeared "closed up," and a notice was left for mother inside the screen door. Up until October 19, 2010, the social worker had been in emergency telephone contact with mother; mother would not provide an address, saying she was homeless and was going to different hotels. On and after October 20, 2010, the

---

[2] According to the Sacramento County Sheriff's Department, mother claimed D.J. punched her in the head because he was trying to jump out of the car and run away; she had an eye injury consistent with this allegation. The officer concluded mother did not cause D.J.'s injury.

social worker left multiple messages for mother on her cell phone informing her of the October 27, 2010, court date; no calls were returned. There were no relatives to consider for placement: Barbara J.'s home had not passed a kinship evaluation, and Patricia B. could not care for the minor due to poor health.

After the initial hearing on October 27, 2010, the matter was repeatedly continued because the minor had not been located. On November 18, 2010, the juvenile court removed the matter from calendar but informed the parents that the protective custody warrant for the minor remained in effect.

On April 3, 2012, the minor was found in the custody of the parents, who claimed they had not known there was a warrant out on the minor and had thought the case was closed. The Department filed an amended section 300 petition, which added the allegations that mother's reunification services as to D.J., and the parents' rights as to the minor's three siblings, had been terminated.

Father filed a Judicial Council form ICWA-020 claiming Cherokee heritage. Mother denied Indian ancestry.

At the initial hearing on April 6, 2012, the juvenile court found father was the minor's presumed father and ordered him to complete the Indian ancestry questionnaire (or "supplemental questionnaire") and return it to the Department within two days.

On April 11, 2012, the juvenile court ordered the minor detained. The court ordered father to complete and return the supplemental questionnaire "today."

On April 23, 2012, ICWA paralegal Tony Ringor declared that because father had not responded to any attempts to contact him, the three Cherokee tribes had been sent only the limited information available to Ringor as to the parents' ancestry: the names, addresses, and birth dates of the paternal and maternal grandmothers.

The Department's jurisdiction/disposition report recommended placement of the minor outside the home and bypassing services to the parents (mother pursuant to

5

§ 361.5, subd. (b)(10), (11), & (13); father pursuant to § 361.5, subd. (b)(10) & (11) only).

The report stated that the parents continued to claim they had been unaware there was a warrant out for the minor. They denied all allegations of current substance abuse and domestic violence.

If the minor was not returned to the parents, mother wanted her placed with the maternal grandmother, Barbara J. The maternal grandmother wanted placement, and father and other members of the family would support it. The kinship unit had approved the maternal grandmother's home for placement as of April 10, 2012.

The maternal grandmother, a widow with four children and eight grandchildren, had recently retired after 30 years at Kaiser Permanente. She lived alone in a three-bedroom, two-bathroom home. She could use the maternal aunt to help with childcare if needed. She was diabetic but indicated the condition was under control. She was willing to adopt the minor or to serve as her legal guardian.

The social worker had "concerns" about this proposed placement. First, the maternal grandmother did not call CPS after learning that CPS was looking for the minor, apparently because she believed mother's story that the case was closed; the maternal grandmother said she had no control over mother. Second, the maternal grandmother had kicked D.J. out of her home; she had failed a kinship assessment as to him and had never been assessed as to the minor's siblings. Third, her diabetes might not be under control: the fire department was called to the maternal grandmother's home on February 18, 2012, in response to a report that she was incoherent and might be having a "diabetic episode."

On May 4, 2012, ICWA paralegal Ringor declared that one of the three Cherokee tribes had returned a negative response and the other two had not yet responded.

6

On the same date, the juvenile court held a prejurisdictional status conference but continued it because father was allegedly in the hospital.[3] Noting that the Department had not yet received father's supplemental questionnaire, the court reordered him to comply with the prior order to complete and return the questionnaire. The court ordered the Department to analyze whether services should be denied to the parents under section 361.5, subdivision (b)(15).[4]

At the rescheduled prejurisdictional status conference on May 11, 2012, the juvenile court asked father's counsel whether the information in Judicial Council form ICWA-030 (the form sent to the tribes) was "complete and accurate." Counsel said "Yes." Counsel also said, "As to [father] the information . . . that appears on the ICWA 30 [*sic*] is correct."

Father's counsel said father had completed the supplemental questionnaire and "placed it in the mailbox downstairs." The court observed that that mailbox was for the use of court staff only, so anything placed there would not have reached the Department.

The court set an ICWA compliance hearing for July 13, 2012.

The parents requested placement with the maternal grandmother. The court tentatively denied the request but promised to revisit the issue. The court expressed concern that the maternal grandmother had failed a kinship screening as to D.J. and that emergency services had been called to her home in February 2012. The court also noted that because it needed to consider concurrent planning efforts, the maternal grandmother should undergo an adoption home study as soon as possible.

---

[3] From this point on, Referee Marlene Hertoghe presided over the case.

[4] The Department concluded that this provision also applied because the parents willfully abducted the minor and kept her whereabouts unknown from October 2010 to April 2012.

7

On May 17, 2012, ICWA paralegal Ringor declared that the second of the three Cherokee tribes had returned a negative response; the third had not yet responded.

The Department filed an addendum recommending placement of the minor with the maternal grandmother. Her home had not been approved as to D.J. because D.J.'s father was living there, but he had since left.

At the pretrial jurisdiction/disposition conference on May 25, 2012, the juvenile court noted that that as of the day before, the ICWA paralegal still had not received father's supplemental questionnaire.

The court stated it was still concerned as to whether placement with the maternal grandmother was consistent with the best interest of the minor, given "the need to consider concurrent planning." The court was also concerned about "the potential protection issues" in that there was evidence a social worker had tried to serve the protective custody warrant at the maternal grandmother's home, yet she now claimed she did not know CPS was looking for the minor. The court reserved further consideration of this issue for the jurisdiction/disposition hearing.

The contested jurisdiction/disposition hearing took place on June 1, 2012.

Father testified that the parents did not realize there was a warrant out for the minor because her case came up together with the ongoing cases of her siblings, on which the parents were focused. When they heard that the minor's case was removed from calendar, they concluded it had been dropped. The minor was living with an aunt in the Bay Area for most of the time she was supposedly missing.

Father claimed he and mother had no relationship now. He was homeless but looking for housing, and had been employed for three weeks. He claimed he was doing visitation and services insofar as he had been given them. He denied domestic violence or current substance abuse by himself or mother. Placement with the maternal grandmother was acceptable to him.

8

Mother's counsel and the minor's counsel also supported placement with the maternal grandmother.

The juvenile court bypassed reunification services to mother under the provisions of section 361.5, subdivision (b)(10), (11), (13), and (15) and to father under section 361.5, subdivision (b)(10), (11), and (15), and set a section 366.26 hearing on August 17, 2012.

The court again denied placement with the maternal grandmother but noted, "the Department can continue to assess this [and t]he grandmother is certainly free to get an adoption home study[.]" The court acknowledged the statutory preference for relative placement (§ 361.3), but found that it would not be in the minor's best interest for the following reasons: (1) the maternal grandmother knew of the warrant for the minor and frustrated its execution, which also put her credibility in question; (2) when the maternal grandmother had care of D.J., things had gone wrong; (3) the maternal grandmother's state of health was still undetermined; and (4) given the impending section 366.26 hearing, preferential consideration must go to a home that could adopt the minor.

The ICWA paralegal filed an informational memorandum on July 5, 2012, which stated that the last of the Cherokee tribes had returned a negative response.

At a combined ICWA compliance hearing and section 366.26 status review hearing on July 13, 2012, the juvenile court found the minor was not an Indian child.

At a placement hearing on July 20, 2012, the juvenile court observed that the Department was now pursuing placement in the home of one of the minor's siblings who had been adopted. County counsel said the minor had not yet been placed there because the home did not currently qualify as an adoptive home (the prospective foster parents had given up their foster-care license after adopting the minor's sibling) or an NREFM (nonrelative extended family member) placement; the Department was investigating how to get approval for the placement. The minor's counsel supported the Department's

9

recommendation. Father's and mother's counsel objected but did not offer argument or propose alternatives.

Noting that the maternal grandmother was present, the court invited her to "talk to the Court."[5] The maternal grandmother stated:

A CPS investigative social worker came to the maternal grandmother's home before the minor was detained but did not mention that she had a warrant for the minor. She said only that she was there "to look in on the well care [*sic*] of Baby [L.]"

D.J.'s allegations that the maternal grandmother beat him and that she was a drug addict were false. Nevertheless, even though he had lied about her, she loved him and still took care of him.

Her diabetes was not a problem. Her doctor had given her a "bill of health."

She loved all of her grandchildren and fought for the chance to take care of them; being retired, she could easily take care of the minor. It was painful to her that all of mother's children had been "taken away."

The juvenile court replied that the maternal grandmother's claim that the CPS social worker had not mentioned a warrant conflicted with the social worker's statement that she had been there attempting to execute a warrant, which is part of an investigative social worker's job. The court was concerned about "the willingness to cooperate with CPS, with the Court, and ensure that . . . the baby is kept safe from her parents." The social worker's statement created an inference that the maternal grandmother had been "less than cooperative" in a case where the minor was absent from the court's jurisdiction with an outstanding protective custody warrant "for a very considerable period of time."

---

[5] The court did not place her under oath.

10

D.J.'s statements indicated that he might have suffered inappropriate corporal punishment from several relatives, including the maternal grandmother, and that there was a lack of "appropriate care in the home."[6]

It mattered that law enforcement had been called to the maternal grandmother's home due to concerns about her health because the minor was "in need of a forever home now." If the court placed the minor with the maternal grandmother, it would take a year or so to determine whether the minor could stabilize there and whether the concerns about the maternal grandmother's health and D.J.'s allegations were unfounded. But the minor had already waited a long time for stability and permanence.

For all of these reasons, it was in the minor's best interest to proceed with placement in a home that did not have the "difficulties" apparent in the maternal grandmother's home.

The Department's section 366.26 report, filed August 7, 2012, recommended termination of parental rights and adoption. The minor was generally adoptable. The Department still planned to place her with her adopted sibling once the caretakers had updated their foster care license. Their visitation with the minor had gone well. They were eager to take her into their home and to provide permanency through adoption.

On the morning of August 17, 2012, the juvenile court held a section 366.26 hearing. Neither parent was present. Father's counsel, who did not know why father was absent, requested a continuance, but the court denied the request for lack of good cause. Over the objection of the parents' counsel, the court ordered the termination of parental rights and a permanent plan of adoption.

On August 21, 2012, the juvenile court entered its order in writing.0

On August 23, 2012, father's counsel filed a notice of appeal from the order.

_____

[6] The court observed that D.J. had alleged his uncle had beaten him after learning that D.J. is homosexual.

11

On the same date, father's counsel filed a "Notice of Motion and Motion for Reconsideration Pursuant to Code of Civil Procedure Section 1008."  The motion also cited Welfare and Institutions Code section 252, which provides in part:  "At any time prior to the expiration of 10 days after service of a written copy of the order and findings of a referee, a minor or his or her parent or guardian . . . may apply to the juvenile court for a rehearing."[7]

The motion asserted that, unknown to counsel at the time of the hearing, father had called the courthouse and left a voice mail message with the court clerk at 8:44 a.m., advising he would be late to court.  Father requested a rehearing so that he could be present for the proceedings and participate in the section 366.26 hearing.

On August 24, 2012, Referee Hertoghe set the motion for reconsideration for hearing on August 31, 2012.

At the hearing on August 31, 2012 (at which father was present, but not mother), Referee Hertoghe granted reconsideration, set aside the order terminating parental rights, and set a contested section 366.26 hearing on September 11, 2012.[8]

On September 5, 2012, mother, in propria persona, filed a notice of appeal from the August 17, 2012, order terminating parental rights.

On September 11, 2012, Referee Hertoghe held a contested section 366.26 hearing.  The parents were present.  Neither presented evidence, but both made unsworn

---

[7] Section 252 also provides:  "If all of the proceedings before the referee have been taken down by an official reporter, *the judge of the juvenile court* may, after reading the transcript of those proceedings, grant or deny the application."  (Italics added.)  Father's motion did not quote this portion of the statute.

[8] All counsel submitted on the motion without argument.  No counsel mentioned that father had filed a notice of appeal from the August 17, 2012, order or that section 252 requires a juvenile court judge to consider an application for rehearing of a juvenile court referee's order.

statements (having been advised that the court would not consider such statements as evidence). The parents' counsel argued that termination of the parents' relationships with the minor would be detrimental to her. Referee Hertoghe once again ordered the termination of parental rights.

Father alone filed a notice of appeal from the second order terminating parental rights.

## DISCUSSION

## I

Respondent contends that the disentitlement doctrine bars this appeal. We disagree.

" 'The disentitlement doctrine has been applied to deprive a party of the right to present a defense as a result of the litigant's violation of the processes of the court, withholding of evidence, defaulting on court-imposed obligations, disobeying court orders, or other actions justifying a judgment of default. [Citation.] The case for application of the doctrine is most evident where . . . the party is a fugitive who refuses to comply with court orders or make an appearance despite being given notice and an opportunity to appear and be heard. [Citation.]' " (*In re Kamelia S.* (2000) 82 Cal.App.4th 1224, 1229 (*Kamelia S.*).) Though typically applied against fugitives from the courts, disentitlement may also be imposed on a nonfugitive party "who has signaled by his conduct that he will only accept a decision in his favor" and will frustrate any attempt to enforce a judgment against him. (*Polanski v. Superior Court* (2009) 180 Cal.App.4th 507, 532 (*Polanski*); see also *In re Marriage of Hofer* (2012) 208 Cal.App.4th 454.)

The doctrine is "not an automatic rule but a discretionary tool of the courts that may only be applied when the balance of all equitable concerns leads the court to conclude that it is a proper sanction for a party's flight." (*Polanski, supra,* 180 Cal.App.4th at p. 533.) "In a noncriminal context, courts routinely decline to

13

disentitle litigants on the basis of contempt, fugitive status, or noncompliance with court orders when the issues raised by the litigant entail interests beyond the personal of the individual petitioner, such as the welfare of minor children . . . ." (*Id*. at p. 536.)

The Department asserts that because the parents absconded with the minor and concealed her from the courts for over a year, they are disentitled to pursue this appeal— even though their misconduct ended in April 2012, they have submitted themselves and the minor to the juvenile court's jurisdiction since then, and the minor is no longer in their custody. We disagree.

The Department relies only on *Kamelia S*., *supra*, 82 Cal.App.4th 1224, while acknowledging the case is distinguishable. Indeed it is. In *Kamelia S*., the appellant father absconded with the minor *while his appeal from the juvenile court's order removing her from his custody and placing her in foster care was pending*, and the whereabouts of the father and the minor were unknown when the appellate court considered the case. (*Id.* at p. 1226.) In other words, at the very moment appellant sought a hearing, he " '[stood] in an attitude of contempt to legal orders and processes of the courts of this state.' [Citation.]" (*Id*. at p. 1229.) That is not this case.

We conclude that "the balance of all equitable concerns" (*Polanski*, *supra*, 180 Cal.App.4th at p. 533) does not justify applying the disentitlement doctrine here.

## II

Having determined that the parents may pursue their appeals, we must decide which appeal(s). We conclude that the operative appeals are those in case No. C071919, because the order from which those appeals were taken—the first order terminating parental rights—was not set aside in the manner required by law, and thus became final and conclusive. Therefore, the court's second order terminating parental rights, from which father's appeal in case No. C072166 is taken, was void, and that appeal must be dismissed.

14

"Any order of the court permanently terminating parental rights under this section shall be conclusive and binding upon the child [and] upon the parent or parents . . . . After making the order, the juvenile court shall have no power to set aside, change, or modify it, except as provided in paragraph (2)[9], but nothing in this section shall be construed to limit the right to appeal the order."  (§ 366.26, subd. (i)(1).)  Thus, once the order of August 17, 2012, became final, the juvenile court could not set it aside.  (*In re R.S.* (2009) 179 Cal.App.4th 1137, 1152 (*R.S.*).)

The time when that order became final is determined by sections 250, 252, and 254, which deal with juvenile court referees' orders and the means of rehearing them.  As we shall explain, because father did not follow the required procedure for seeking and obtaining rehearing of the referee's order, it became final 10 days after notice of the order was served on the parties—that is, on or around August 31, the date when the referee purported to set the order aside.

"Except as provided in Section 251[10], all orders of a referee other than those specified in Section 249 [i.e., an order removing a minor from his or her home] shall become immediately effective, subject also to the right of review as hereinafter provided, and shall continue in full force and effect until vacated or modified upon rehearing by order of the judge of the juvenile court.  In a case in which an order of a referee becomes effective without approval of a judge of the juvenile court, it becomes final on the expiration of the time allowed by Section 252 for application for rehearing, if application

---

**9**  Paragraph (2), which deals with tribal customary adoption orders, is inapplicable here.

**10**  Welfare and Institutions Code section 251 provides that the judge or presiding judge of the juvenile court may establish requirements that a referee's order must be expressly approved by a judge of the juvenile court before becoming effective.  This has not been done in Sacramento County.  (Cf. Super. Ct. Sacramento County, Local Rules, ch. 7 [juvenile dependency court].)  We judicially notice the Superior Court of Sacramento County, Local Rules.  (Evid. Code, § 452, subd. (e).)

15

therefor is not made within such time *and if the judge of the juvenile court has not within such time ordered a rehearing pursuant to Section 253.*" (§ 250, italics added; see *In re Clifford C.* (1997) 15 Cal.4th 1085, 1093.)

"At any time prior to the expiration of 10 days after service of a written copy of the order and findings of a referee, a . . . parent . . . may apply to the juvenile court for a rehearing.  That application may be directed to all or to any specified part of the order or findings, and shall contain a statement of the reasons the rehearing is requested.  If all of the proceedings before the referee have been taken down by an official reporter, *the judge of the juvenile court may, after reading the transcript of those proceedings, grant or deny the application.*  If proceedings before the referee have not been taken down by an official reporter, the application shall be granted as of right. . . ." (§ 252, italics added.)

"*All rehearings of matters heard before a referee shall be before a judge of the juvenile court and shall be conducted de novo.*" (§ 254, italics added.)

Here, the referee orally ordered the termination of parental rights on August 17, 2012.  On August 20, 2012, the court clerk notified the parents in writing of their right to appeal.  On August 21, 2012, the referee entered her order in writing.[11]  On August 23, 2012, father simultaneously filed his notice of appeal and "motion for reconsideration" (or rehearing).[12]

---

[11]  The record does not show why the written order was entered one day after the court clerk's notice of the right to appeal, which should have been accompanied by a copy of the court's written order.  (Cal. Rules of Court, rule 5.538(b).)  But it does not matter for the resolution of the procedural issues here whether August 20 or August 21 is taken as the date that starts the running of the 10-day period under Welfare and Institutions Code section 252.

[12]  A timely notice of appeal divests the lower court of jurisdiction to take any further action in the case.  (*In re Marriage of Varner* (1998) 68 Cal.App.4th 932, 936.)  That rule does not apply here, however, because father's notice of appeal was premature.

16

Father's motion did not specify that it must be heard by a judge of the juvenile court. His quotation of section 252 omitted the sentence that says so. Nor did the motion cite section 254, which likewise provides that only a judge of the juvenile court can rehear a referee's orders. Thus, by omission, the motion misled the referee into overlooking the required procedure for rehearing her order.[13]

The referee purported to hear and grant father's motion and to set aside her order terminating parental rights within the 10-day time frame required by section 252. But under sections 252 and 254, only a judge of the juvenile court had the authority to do so. The referee's actions, done without subject matter jurisdiction, were void. (See *Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288.) Since they were void, not merely voidable, the parties' consent to the referee's acts or waiver of any jurisdictional defect did not create jurisdiction, and we may consider the issue de novo. (*People v. Williams* (1999) 77 Cal.App.4th 436, 447.)

"In matters heard by a referee not acting as a temporary judge, a notice of appeal must be filed within 60 days *after* the referee's order becomes final under [California Rules of Court,] rule 5.540(c)." (Cal. Rules of Court, rule 8.406(a)(2), italics added.) Rule 5.540(c) provides: "An order of a referee becomes final 10 calendar days after service of a copy of the order and findings under [California Rules of Court,] rule 5.538, if an application for rehearing has not been made within that time or if the judge of the juvenile court has not within the 10 days ordered a rehearing on the judge's own motion under [California Rules of Court,] rule 5.542."

By filing the notice of appeal only three days after the court clerk (presumably) served a copy of the referee's order on the parties, father purported to appeal from an order that had not yet become final. We may, and we do, treat father's notice of appeal as if filed timely, so as to preserve his right to appeal. (Cf. Cal. Rules of Court, rule 8.104(d).) But because it was premature, it did not divest the juvenile court of jurisdiction.

[13] We also note that the Superior Court of Sacramento County, Local Rules mandate the use of a specified form for an application for rehearing of a referee's order and state that "the court will not accept for filing an application that does not utilize the form as the first page of the application." (Super. Ct. Sacramento County, Local Rules, rule 7.26(c).) No such form appears in the record.

17

Once the referee's original order terminating parental rights became final, the juvenile court had no power to set it aside or to make a new order purporting to terminate parental rights thereafter. (§ 366.26, subd. (i)(1); *R.S.*, *supra*, 179 Cal.App.4th at p. 1152.) Therefore, the referee's second order purporting to terminate parental rights was also void. Father's appeal in case No. C072166, which is taken from that order, must be dismissed.

**III**

Mother, joined by father, contends the juvenile court's denial of placement with the maternal grandmother "must be reversed in view of the clear legislative preference for relative placement." Respondent replies that this contention is procedurally barred and that the court did not abuse its discretion in denying the placement request. We conclude the contention is properly before us but fails on the merits.

**Procedural arguments**

Respondent asserts (1) neither parent appealed from "the July 20, 2012 placement order or any other placement order," (2) appeal of "the June 1, 2012 relative placement order is time barred," (3) mother lacks standing to appeal "the July 20, 2012 order regarding placement of the child because she had been bypassed for reunification services at the disposition hearing and parental rights were terminated prior to appeal," and (4) mother forfeited the relative placement issue. These arguments are unpersuasive.

We agree with mother that the operative order is the order made at the July 20, 2012, placement hearing. At the earlier jurisdiction/disposition hearing, held on June 1, 2012, the juvenile court indicated that its ruling as to the maternal grandmother was not final: "So I have carefully considered this, because I do think . . . the law contemplates that children are better off in the home of a relative. The concerns noted in the original jurisdictional report . . . in terms of the psychosocial background have not been answered by simply hearing the kinship [*sic*] has approved the home. *So the Department can continue to assess this. The grandmother is certainly free to get an adoption home study*,

18

but *at this time* the child needs to be placed in the home that is able and willing to proceed with adoption." (Italics added.) On July 20, 2012, the court heard from the maternal grandmother on the concerns that had been raised against placement with her, then definitively ruled against that placement. On our reading of the record, it is the later ruling that settled the question.

Mother's pro se notice of appeal from the August 17, 2012, order terminating parental rights purported to challenge orders going back to April 6, 2012. Construing the notice of appeal liberally in favor of its sufficiency (cf. Cal. Rules of Court, rule 8.100(a)(2)), we conclude the notice properly encompassed the order denying placement with the maternal grandmother. Mother's notice of appeal was filed September 5, 2012, within 60 days of the date the order was made. (Cal. Rules of Court, rule 8.104(a).)

With respect to mother's standing to raise the placement issue, we conclude that she has standing to challenge the order denying placement to the maternal grandmother because a different order could have affected her ability to contest the termination of parental rights.

"Not every party has standing to appeal every appealable order. Although standing to appeal is construed liberally, and doubts are resolved in its favor, only a person aggrieved by a decision may appeal. [Citations.] An aggrieved person, for this purpose, is one whose rights or interests are injuriously affected by the decision in an immediate and substantial way, and not as a nominal or remote consequence of the decision. [Citations.] These rules apply with full force to appeals from dependency proceedings. [Citation.]" (*In re K.C.* (2011) 52 Cal.4th 231, 236 (*K.C.*).)

"A parent's appeal from a judgment terminating parental rights confers standing to appeal an order concerning the dependent child's placement only if the placement order's reversal advances the parent's argument against terminating parental rights." (*K.C.*, *supra*, 52 Cal.4th at p. 238.)

19

In *In re Esperanza C.* (2008) 165 Cal.App.4th 1042 and *In re H.G.* (2006) 146 Cal.App.4th 1 (cited with approval in *K.C.*, *supra*, 52 Cal.4th at pp. 237-238), the reviewing courts held that parents had standing to appeal from orders concerning relative placement because those orders could affect the ultimate question whether the parents' rights would be terminated. In *H.G.*, a section 387 order removing the minor from the grandparents' care "ha[d] the potential to alter the court's determination of the child's best interests and the appropriate permanency plan for that child, and thus [might] affect [the] parent[s'] interest in [their] legal status with respect to the child." (146 Cal.App.4th at p. 10.) In *Esperanza C.*, the court applied this reasoning to the denial of a section 388 petition seeking placement with the maternal great-uncle and his wife. (165 Cal.App.4th at pp. 1050-1051, 1053-1054.) Both courts cited the "relative caregiver" exception to adoption (§ 366.26, subd. (c)(1)(A)), which provides that if a child is living with a relative who can serve as a legal guardian but is unwilling or unable to adopt, and removal from the relative would be detrimental to the child's well-being, the juvenile court should not terminate parental rights (*Esperanza C.*, *supra*, 165 Cal.App.4th at p. 1054; *H.G.*, *supra*, 146 Cal.App.4th at p. 10 [§ 366.26, former subd. (c)(1)(D)]).

The maternal grandmother stated she would be willing to adopt the minor or to serve as legal guardian. But it was never determined that she would be able to adopt since she had not passed an adoption home study and her state of health remained uncertain. Thus, had the minor been placed with her, the relative caregiver exception to adoption might have applied, giving mother an argument against the termination of her parental rights, which absent such placement she did not have. Mother was therefore aggrieved by the order denying placement and has standing to challenge it. (*K.C.*, *supra*, 52 Cal.4th at p. 238.)

Finally, we reject respondent's forfeiture claim. This contention rests only on the fact that mother did not raise the relative caregiver exception to adoption at the

20

section 366.26 hearing. But since the minor had not been placed with the maternal grandmother, mother could not have raised that exception to adoption.

For all the above reasons, mother's challenge to the order denying placement with the maternal grandmother is properly before us.

**Substantive arguments**

On the merits, however, we agree with respondent that mother has failed to show error.

As the parties correctly state, the standard of review for placement orders is abuse of discretion. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318 (*Stephanie M.*).) We may overturn the juvenile court's determination only if it was arbitrary, capricious, or patently absurd. (*Ibid.*) So far as the court drew reasonable inferences from the facts before it, we cannot put aside its decision and substitute our own. (*Id.* at p. 319.)

If a minor is removed from his or her parents' custody, "preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative." (§ 361.3, subd. (a).) "Preferential consideration" means that "the relative seeking placement shall be the first placement to be considered and investigated."
(§ 361.3, subd. (c)(1).)

But the statute does not mandate such placement. Rather, it sets out a long but nonexclusive list of factors that the juvenile court must consider "[i]n determining whether placement with a relative is appropriate[.]" (§ 361.3, subd. (a)(1)-(8).) These include, among others, "[t]he best interest of the child" (§ 361.3, subd. (a)(1)); "[t]he good moral character of the relative . . . , including whether any individual residing in the home has a prior history of violent criminal acts or has been responsible for acts of child abuse or neglect" (§ 361.3, subd. (a)(5)); and "[t]he ability of the relative to do the following: [¶] (A) Provide a safe, secure, and stable environment for the child. [¶] (B) Exercise proper and effective care and control of the child. [¶] . . . [¶] (D) Protect the child from his or her parents." (§ 361.3, subd. (a)(7).)

21

Here, the juvenile court appropriately considered and investigated placement with the maternal grandmother prior to disposition. However, at the jurisdiction/disposition hearing the court made tentative findings adverse to the placement, based on all of the statutory criteria we have quoted. The court found that the placement would not serve the best interest of the child (§ 361.3, subd. (a)(1)) because (1) having been concealed from the court for over a year by parents who would not be granted services, the child needed permanence and stability as soon as possible, and (2) the grandmother's apparent connivance in the parents' concealment raised doubts as to whether that need would be well served by placement with her (§ 361.3, subd. (a)(7) (A), (B) & (D)); the unresolved question whether the grandmother had mistreated the minor's half sibling or allowed others to do so (§ 361.3, subd. (a)(5)); and the uncertainty about the grandmother's health (§ 361.3, subd. (a)(7)(A), (B)). All of these concerns were supported by evidence in the record. Nevertheless, the court urged the Department to continue investigating the placement and recommended that the grandmother obtain an adoption home study. Thus, the court had not ruled out the possibility that the grandmother could resolve the court's concerns in her favor.

At the subsequent placement hearing, however, the Department recommended a placement plan more likely to lead to early adoption. The grandmother had not obtained an adoption home study or presented any further evidence to support placement with her. The court reasonably found her oral responses to the allegations against her insufficient to allay the court's doubts about the wisdom of placing the minor in her home. Indeed, so far as she disputed the investigative social worker's claim that the social worker had attempted to execute the protective custody warrant for the minor at the grandmother's home, her assertions raised further doubts about her credibility and her ability or willingness to protect the minor from the parents. Thus, the court had, if anything, less reason than before to accept at face value the grandmother's claims of robust health and her denial that she had mistreated the minor's half sibling.

22

Given these facts and the reasonable inferences the court drew from them, the court's denial of placement with the maternal grandmother was not arbitrary, capricious, or patently absurd. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) The fact that the evidence could be viewed more favorably to the proposed placement does not justify overturning the court's order. (*Id.* at p. 319.)

## IV

Father, joined by mother, contends the matter must be remanded due to a failure of compliance with ICWA. We agree.

When the juvenile court knows or has reason to know that a child involved in a dependency proceeding is an Indian child, ICWA requires that notice of the proceedings be given to any federally recognized Indian tribe of which the child might be a member or eligible for membership. (25 U.S.C. §§ 1903(8), 1912(a); *In re Robert A.* (2007) 147 Cal.App.4th 982, 989.) There is "an affirmative and continuing duty to inquire" whether a child is or may be an Indian child. (Welf. & Inst. Code, § 224.3, subd. (a).) Notice requirements are construed strictly. (*Robert A.*, *supra*, 147 Cal.App.4th at p. 989.) Where notice has been given, any error in notice is subject to harmless error review. (*Nicole K. v. Superior Court* (2007) 146 Cal.App.4th 779, 784 (*Nicole K.*).)

Notice must include all of the following information, if known: the child's name, birthplace, and birth date; the name of the tribe in which the child is enrolled or may be eligible for enrollment; names and addresses (including former addresses) of the child's parents, grandparents, great-grandparents, and other identifying information; and a copy of the dependency petition. (25 C.F.R. § 23.11(d) (1)-(4); Welf. & Inst. Code, § 224.2, subd. (a)(5)(A)-(D); *In re D.W.* (2011) 193 Cal.App.4th 413, 417.)

Because ICWA's primary purpose is to protect and preserve Indian tribes, a parent does not forfeit a claim of ICWA notice violation by failing to raise it in the juvenile court. (*In re J.T.* (2007) 154 Cal.App.4th 986, 991 (*J.T.*); *Nicole K.*, *supra*,

23

146 Cal.App.4th at p. 783, fn. 1; *In re Marinna J.* (2001) 90 Cal.App.4th 731, 738-739 (*Marinna J.*).)

The tribes never learned anything about father's ancestry other than the name, address, and birth date of the paternal grandmother. Given this meager information, their negative responses to the ICWA inquiry are unsurprising. But there is reason to think more information might have been available if it had been diligently pursued.

The jurisdiction/disposition report shows that the social worker spoke to father by telephone and in person. He gave her the names of the paternal great-grandmother (now deceased); of his brother and sister, with whom he remained in contact; and of his second cousin, a possible candidate for placement. The report also shows that the social worker spoke by telephone to the paternal grandmother.[14]

It appears from the report that father and the paternal grandmother were forthcoming in response to the social worker's inquiries. It does not appear, however, that the social worker asked either of them about father's alleged Indian heritage, even though the report mentions that claim. There is no evidence that the social worker attempted to contact the other relatives whose names father had given her. Finally, it does not appear that the social worker contacted the ICWA paralegal to give him the information that she had obtained about father's family. (Even the name of the paternal great-grandmother, which is required information for ICWA notice if known, was never given to the tribes.) Given the living relatives that might reasonably have been expected to have information relevant to father's claim of Indian ancestry, the social worker's apparent failure to inquire further of father or the paternal grandmother, to contact

---

[14] Respondent asserts that it would have been futile to try to get more information from the paternal grandmother because she was hostile toward the Department during the period when the minor's whereabouts were concealed. But the jurisdiction/disposition report does not indicate that the paternal grandmother remained hostile to the Department after it had located and detained the minor.

father's siblings and second cousin, or to provide those relatives' names and contact information to the ICWA paralegal amounts to a failure to carry out the "affirmative and continuing duty to inquire" imposed by ICWA. (§ 224.3, subd. (a).)

It is true, as respondent asserts, that father was not cooperative with the juvenile court or the ICWA paralegal, and that his counsel told the court the information on the ICWA notice form was correct. But because ICWA is intended to protect the interests of the tribes, not those of the parents, neither father's misfeasance nor his counsel's statement can defeat father's claim of ICWA notice violation or estop him from raising it on appeal. (*J.T.*, *supra*, 154 Cal.App.4th at p. 991; *Nicole K.*, *supra*, 146 Cal.App.4th at p. 783, fn. 1; *Marinna J.*, *supra*, 90 Cal.App.4th at pp. 738-739.)

Respondent speculates at length that the social worker tried to obtain the required information, but the persons she spoke to simply did not have it. But such speculation is insufficient to establish that the Department fulfilled its duty of inquiry. Based on the jurisdiction/disposition report, which is supposed to contain all information relevant to the juvenile court's decision-making process, there is no evidence that the social worker asked the persons she spoke to any questions about the family's alleged Indian ancestry, or that she made any attempt to contact the other living family members whose names she was given.

In light of the Department's failure to perform its duty of ICWA inquiry, we cannot uphold the juvenile court's finding that ICWA did not apply. Therefore, we must vacate the court's orders terminating parental rights and ordering a permanent plan of adoption, and remand the matter for further ICWA proceedings.

**DISPOSITION**

In case No. C071919, the matter is remanded to the juvenile court with directions to vacate its orders terminating parental rights and ordering a permanent plan of adoption, and to renotice the tribes with any further information the Department may obtain through a properly diligent inquiry. If the court finds, after the new notice has been

given, that ICWA has been complied with and does not apply, the court shall reinstate its orders terminating parental rights and ordering a permanent plan of adoption. If the court finds that ICWA applies, it shall proceed in accordance with ICWA.

In case No. C072166, father's appeal is dismissed.


                                        _____RAYE_____, P. J.


We concur:


_____HULL_____, J.


_____MAURO_____, J.

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[15]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re L. J., a Person Coming Under the Juvenile Court Law. | C071919 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C. W. et al.,<br><br>Defendants and Appellants. | (Super. Ct. No. JD231066)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| In re L. J., a Person Coming Under the Juvenile Court Law. | C072166 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>C. W.,<br><br>Defendant and Appellant. | (Super. Ct. No. JD231066) |

---

[15] Pursuant to California Rules of Court, rule 8.1110(b), this opinion is certified for publication with the exception of parts III and IV.

APPEALS from a judgment (orders) of the Superior Court of Sacramento County, Marlene E. Hertoghe, Referee. C071919 remanded with directions; C072166 dismissed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant C. W.

Marin Williamson, under appointment by the Court of Appeal, for Defendant and Appellant L. J.

John F. Whisenhunt, County Counsel, and Claire Van Dam, Deputy County Counsel, for Plaintiff and Respondent.

THE COURT:

The opinion in the above-entitled matters filed on May 1, 2013, was not certified for publication in the Official Reports. For good cause it now appears that the opinion should be partially published in the Official Reports and it is so ordered.

BY THE COURT:


      RAYE      , P. J.


      HULL      , J.


      MAURO      , J.